O

# United States District Court
# Central District of California

| | |
|---|---|
| LEPTON LABS, LLC; FOCUS MARKETING LLC,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>JASON DURANT WALKER; RACHEL LASSEFF; GULF RAYZ MEDIA, LLC; ANDREW JENSEN; STRATIX HEALTH, LLC; W4, LLC; DOES 1–10, inclusive,<br><br>　　　　　Defendants. | Case № 2:14-cv-04836-ODW(MANx)<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS [22]** |

## I. INTRODUCTION

Can a website's design constitute protectable trade dress under the Lanham Act? If so, under what circumstances? The Court must squarely confront these issues and others in this Motion to Dismiss filed by Defendant W4, LLC.

This action arises out of W4's alleged misappropriation of Plaintiff Lepton Labs, LLC's trade-secret and trade-dress information relating to AllDaySlim, a dietary supplement sold by Plaintiffs. Plaintiffs allege that W4 disclosed this confidential information to Defendants Gulf Rayz Media, LLC and Andrew Jensen for their use in

developing a nearly identical website for SlimBlastFast—a competing product—notwithstanding W4's exclusive marketing agreement with Lepton Labs. The Court finds that Plaintiffs may allege protectable trade dress in their website design and that they have also stated actionable claims for contributory trade-dress infringement, unfair competition, and fraud. The Court thus **DENIES** W4's Motion to Dismiss.[1] (ECF No. 22.)

## II. FACTUAL BACKGROUND

Lepton Labs specializes in dietary supplements and has created the supplement called AllDaySlim. (FAC ¶ 3.) Plaintiffs Focus Marketing, a promotion and marketing company, teamed up with Lepton Labs to market and sell AllDaySlim. (*Id.* ¶¶ 4–5.)

In the fourth quarter of 2011, Lepton Labs and Focus Marketing (collectively, "Lepton Labs" or "Plaintiffs") entered into a written advertising agreement with W4—an online performance marketing company. (*Id.* ¶¶ 6, 40, 49, Ex. A.) W4 agreed to direct traffic and generate leads for Lepton Labs's website www.alldayslim.com, which Plaintiffs use to sell AllDaySlim. (*Id.* ¶ 49.) In the agreement, W4 agreed not to "disclose or use the other party's confidential information for any purpose other than the purposes contemplated by [the] agreement." (*Id.* ¶ 53, Ex. A.)

In the second quarter of 2012, W4 became Lepton Labs's exclusive advertising and marketing agent for AllDaySlim. (*Id.* ¶ 55, Ex. B.) Lepton Labs alleges that W4 promised enhanced conversions but omitted the fact that at the same time, W4 was "proactively and maliciously appropriating Plaintiffs' confidential and trade secret information by disclosing such information to a direct competitor of Plaintiffs." (*Id.* ¶ 56.) W4 also employed an alleged comprehensive online tracking system,

/ / /

---

[1] After carefully considering the papers filed in support of and in opposition to the Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

which allowed Lepton Labs to view the status of its online advertising campaigns. (*Id.* ¶ 57.)

To market AllDaySlim, Lepton Labs provided W4 with its trade-secret information relating to the production, advertising, marketing, sale, and distribution of AllDaySlim. (*Id.* ¶ 59.) W4 received access to this information via email and access to Lepton Labs's online MediaPlex account, which tracked Lepton Labs's advertising campaigns' performance. (*Id.* ¶ 60.) Through these avenues, Lepton Labs alleges that W4 gained access to trade-secret information, including Plaintiffs' customers' identities and preferences, product-pricing information, and Plaintiffs' strategy and plans for advertising, marketing, and distributing AllDaySlim. (*Id.* ¶ 61.)

In addition, through extensive tracking and refinement, Lepton Labs was able to develop a particular pattern of messages, photographs, and information, which constituted the most effective advertising creative for promoting AllDaySlim. (*Id.* ¶¶ 62–64.) Lepton Labs's most critical creative component is its landing page, i.e., the first webpage potential customers would visit after clicking an advertising link. (*Id.* ¶ 65.) The landing page includes a refined selection of logos, slogans, motivational content, scientific content, audio-visual content, testimonials, active-ingredient lists, product price, and overall look and feel. (*Id.* ¶ 66.) Lepton Labs maintains the secrecy of this information through various means, including requiring agents to sign confidentiality agreements, communicating the confidentiality of information to employees and sales agents, and disclosing trade-secret information on a need-to-know basis. (*Id.* ¶ 70.)

After acquiring Lepton Labs's confidential AllDaySlim information, W4 began working with Defendant Gulf Rayz to market Gulf Rayz's competing dietary supplement, SlimBlastFast. (*Id.* ¶ 73.) Plaintiffs contend that Gulf Rayz is a shell company directed by Defendant Andrew Jensen. (*Id.* ¶¶ 22–28.)

In the first quarter of 2012, former defendant Rachel Lasseff, W4's Vice President of Business Development, contacted Jensen to convince Gulf Rayz to steal

Lepton Labs's trade secrets to use in marketing SlimBlastFast. (*Id.* ¶¶ 42, 76.) On January 18, 2012, Lasseff then sent Jensen an email titled "All Day Slim Creatives" in response to Jensen's request to send "1–2 top email creatives for All Day Slim." (*Id.* ¶ 77, Ex. C.) W4 thus disclosed to Gulf Rayz Lepton Labs's most effective creative materials. (*Id.* ¶ 79.)

W4 and Gulf Rayz subsequently entered into their own exclusive marketing relationship for SlimBlastFast. (*Id.* ¶ 82; *see also* Ex. D.) In marketing SlimBlastFast, Lepton Labs alleges that W4 exploited AllDaySlim's advertising, trade dress, trade secrets, product design, and packaging. (*Id.* ¶ 84.) Lepton Labs contends that W4 employed this confidential information on SlimBlastFast's website by copying various features, including the format, background and text colors, photographs, comparisons, quotations, satisfaction guarantee, text, active-ingredient section, style, and trial offer. (*Id.* ¶ 86; *see also* Ex. E.) Figures 1 through 3 depict side-by-side comparisons of the two websites as reflected in Exhibit E. The alleged copying was so extensive that W4 and Gulf Rayz forgot to remove Lepton Labs's customer-service telephone number, which resulted in W4's customers actually calling Lepton Labs. (*Id.* ¶ 88.) These erroneous telephone calls are what led Lepton Labs to investigate W4. (*Id.* ¶¶ 89–91.) Gulf Rayz also linked images on its site from Lepton Labs's website so that when a user visited the SlimBlastFast website, the site would pull the images from the AllDaySlim site. (*Id.* ¶¶ 93–95; *see also* Ex. F.)

**Figure 1**



**Figure 2**



**Figure 3**



W4 represented to its clients that they could use its online tracking system to view a particular customer's own campaigns as well as all campaigns W4 was running for other customers. (*Id.* ¶¶ 100–01.) But Lepton Labs alleges that W4 concealed its SlimBlastFast campaign from the tracking system, thus preventing Lepton Labs from learning about its work for Gulf Rayz. (*Id.* ¶¶ 102, 104.)

Armed with information stemming from its investigation, Lepton Labs confronted W4 about the alleged copying. (*Id.* ¶ 105.) W4 indicated that it would investigate the matter. (*Id.* ¶ 111.) Lepton Labs was finally able to view the

/ / /

SlimBlastFast website source code and saw the word "stolen" coded into the site. (*Id.* ¶ 113.)

### III. LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

### IV. DISCUSSION

W4 argues that Plaintiffs have not alleged trade-secret misappropriation under the California Uniform Trade Secrets Act or that they have any protectable trade dress in their website's design sufficient to establish infringement under federal law. The Court disagrees with W4 on all grounds and denies its Motion to Dismiss.

/ / /

/ / /

### A. Trade secret

California prohibits "misappropriation of a "trade secret," that is, acquisition, disclosure, or use of a trade secret "by a person who knows or has reason to know that the trade secret was acquired by improper means." Cal. Civ. Code § 3426.1(b); *see also Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1025 (Ct. App. 2000) (defining "misappropriation"). A protectable trade secret includes information that "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use" and is the subject of reasonable measures to maintain its secrecy. Civ. Code § 3426.1(d). The statute defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 3426.1(a).

W4 argues that Lepton Labs has not established that it misappropriated any "trade secret" within the meaning of the statute. W4 asserts that it did not acquire the information improperly, as Lepton Labs provided the information to W4 through their marketing agreement, voluntary disclosures, and access to Lepton Labs's online MediaPlex account. W4 also contends that it did not "use" the information, because what they disclosed to Gulf Rayz did not qualify as a trade secret. Finally, they argue that Lepton Labs did not keep their information secret, because W4 believes Plaintiffs attached the alleged trade secrets to the Complaint in the Jensen email string.

But Lepton Labs asserts that it set forth a detailed list of the categories of trade secrets that W4 acquired and disclosed to Gulf Rayz and Jensen. Lepton Labs contends that W4 misappropriated the trade secrets by disclosing the information to Gulf Rayz without authorization, such as through Jensen's "All Day Slim Creatives" email and Jensen's chat with a W4 representative.

Lepton Labs defined its trade secrets as its AllDaySlim creative material; strategy and plans for advertising, marketing, and distribution of its products; identities and detailed information related to its customers; detailed information

1  related to its customers' preferences; and information relating to the pricing of
2  products sold to its agents. (FAC ¶ 136.) Plaintiffs also alleged that this information
3  was not generally known to the public and was the subject of reasonable measures to
4  maintain its secrecy, such as requiring employees and agents to sign confidentiality
5  agreements and disclosing information only on a need-to-know basis. (*Id.* ¶ 139.)
6  These allegations readily put Defendants on notice of Lepton Labs's "trade secrets"
7  within the meaning of section 3426.1.

8        Plaintiffs also sufficiently established that Defendants misappropriated these
9  trade secrets. They allege that "[i]n or around the first quarter of 2012, W4, act[ing]
10 in concert with the Gulf Rayz Defendants, improperly disclosed Plaintiffs'
11 confidential and proprietary information and trade secrets to the Gulf Rayz
12 Defendants without the express or implied consent of Plaintiffs." (*Id.* ¶ 141.)
13 Moreover, the most damning allegations come from the email titled "All Day Slim
14 Creatives" sent from W4's Rachel Lasseff to Gulf Rayz's Jensen. Lasseff states that
15 she "sent them all," referring to Plaintiffs' email creatives. (*Id.* Ex. C.) Lasseff
16 further provides AllDaySlim trade-secret information in her chat with Jensen. (*Id.*
17 Ex. G.) Faced with all of this information, it is difficult to find that Plaintiffs have not
18 adequately alleged misappropriation.

19       The Court thus finds that Plaintiffs alleged a viable trade-secrets claim under
20 California Civil Code section 3426.1 and **DENIES** W4's Motion on this ground.

21 **B.**     **Trade-dress infringement**

22       The Lanham Act prohibits any person from using another's trade dress in
23 commerce in connection with any goods or services. 15 U.S.C. § 1125(a). Trade
24 dress is protectable "if it is nonfunctional and has acquired secondary meaning and if
25 its imitation creates a likelihood of consumer confusion." *Fuddruckers, Inc. v. Doc's
26 B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987); *First Brands Corp. v. Fred
27 Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987). A product feature is nonfunctional
28 if it is not essential to the product's use and does not affect its cost or quality of the

article. *See Fuddruckers*, 826 F.2d at 842. But the functionality analysis focuses on the item as a whole—not on whether any one particular feature is functional. *Id.*

Secondary meaning is a question of fact and depends on whether "the purchasing public associates the dress with a single producer or source rather than just the product itself." *First Brands*, 809 F.2d at 1383. Finally, the test for likelihood of confusion assesses "the total effect of the defendant's product and package on the eye and mind of an ordinary purchaser." *Id.* at 1381–84. The plaintiff bears the burden of establishing that a consumer "viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir. 1984) (citation omitted) (internal quotation marks omitted).

As a threshold matter, W4 contends that Lepton Labs has not pleaded any facts establishing that it used any word, mark, symbol, or trade dress in commerce. W4 asserts that since Gulf Rayz owns the allegedly infringing website, W4 did not employ any advertising of its own in commerce. W4 also argues that it never sold any SlimBlastFast by itself. In addition, it contends that Lepton Labs has failed to articulate a protectable trade dress. W4 avers that Plaintiffs merely cataloged a list of their website's features, which it asserts is insufficient to put it on notice of Plaintiffs' alleged trade dress.

But Plaintiffs argue that W4 used the allegedly infringing trade dress in commerce because it entered into an exclusive marketing agreement with Gulf Rayz and used the advertisements resulting from that relationship to market SlimBlastFast in commerce. They contend that they have gone beyond simply cataloging a series of arbitrary and nonfunctional elements of their website, as Plaintiffs have attached a collection of side-by-side photographs demonstrating that Gulf Rayz's website is essentially identical to Plaintiffs' website. Given this virtual identity, Lepton Labs asserts that Defendants are sufficiently put on notice of the look and feel of their website sufficient to establish protectable trade dress.

1 Whether a website's design can constitute protectable trade dress under the Lanham Act is a fairly unsettled issue. *See Parker Waichman LLP v. Gilman Law LLP*, No. 12-CV-4784 JS AKT, 2013 WL 3863928, at *4 n.4 (E.D.N.Y. July 24, 2013) (questioning "whether it is appropriate to ever give websites trade dress protection, because, unlike a product on a shelf, in order to access a website, a user must either know the URL or type a query into a search engine (and, thus, select a website without first seeing its 'look and feel')"). But the courts to have considered the issue have more or less agreed that website design can rise to the level of trade dress under certain circumstances. Courts have generally held that a website's "look and feel" can be trade dress. *See, e.g.*, *Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1244 (W.D. Wash. 2007) ("[D]efendant has cited no authority for proposition that plaintiff cannot qualify its trade dress description as one seeking protection for the 'look and feel' of its website in response to a motion to dismiss."). As one court explained in recognizing a website's design as protectable trade dress, "Like the packaging of a product, the look and feel of a web site invites the user in. It offers a familiar interface, with recognizable elements. Similar colors, sizes, and layouts make navigation and interaction facile." *Conference Archives, Inc. v. Sound Images, Inc.*, No. CIV. 3:2006-76, 2010 WL 1626072, at *21 (W.D. Pa. Mar. 31, 2010).

Several courts have also established that "mere cataloguing of a website's features" is not sufficient to describe protectable trade dress. *Salt Optics, Inc. v. Jand, Inc.*, No. SACV 10-0828 DOC, 2010 WL 4961702, at *5 (C.D. Cal. Nov. 19, 2010). Neither can a plaintiff only list some elements of a website's design among many and claim that those features establish the site's look and feel. *See Parker Waichman*, 2013 WL 3863928, at *4; *Sleep Sci. Partners v. Lieberman*, No. 09-04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010).

Lepton Labs has described its trade dress as the following elements:
    a. formatting of logos, graphics, photographs, and text;
    b. light blue background with clouds behind the logo;

      c. light blue and orange color schematic;

      d. before and after comparison photographs;

      e. comparison chart;

      f. satisfaction guaranteed certificate and language;

      g. text appearing at the bottom of the page, including customer service telephone number;

      h. style and aesthetic of active ingredient section;

      i. presentation of trial offer page; *and*

      j. the particularized combination of all of these elements.

(FAC ¶ 160.) This list of items certainly does appear to be a "catalog" of the website's features, which is something other courts have found insufficient to establish protectable trade dress. *See, e.g.*, *Salt Optics*, 2010 WL 4961702, at *5. But the Court hesitates to decry this pleading method—at least where a plaintiff has not suggested that the components are "only some among many." *See Sleep Sci. Partners*, 2010 WL 1881770, at *3.

      The Ninth Circuit has emphasized that "[t]rade dress is the composite tapestry of visual effects. Courts have repeatedly cautioned that, in trademark—and especially trade-dress cases, the mark must be examined as a whole, not by its individual constituent parts." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001); *accord Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 379 (7th Cir. 1976) (cautioning against dissecting marks), *superseded by statute on other grounds as recognized in Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423 (7th Cir. 1985). But in order to evaluate a plaintiff's trade-dress tapestry, one must first apprise herself of the elements comprising the trade dress. For example, while the Coca-Cola Company might be able to colloquially describe its well-known trade dress as simply its contour bottle design, a court would require much more to satisfy even Rule 8's lenient pleading standard. Coca-Cola might describe its trade dress as a contoured glass or plastic bottle having a plurality of vertical striations extending from

the top to the bottom of the bottle and being interrupted by a smooth, horizontal band nearly half way down the bottle. While this description undoubtedly involves a cataloging of elements, those elements put one on notice that Coca-Cola would claim the overall appearance of the bottle as its trade dress. It would be strange for a court to fault Coca-Cola for providing a detailed description of its bottle in pleading alleged trade-dress infringement, for if Coca-Cola did not provide such a description, its theoretical trade-dress claim would likely fail for vagueness.

While a plaintiff cannot adopt a shifting-sands approach to pleading its alleged trade dress, it is also difficult to require the plaintiff to essentially prove—as opposed to simply allege—that its trade dress satisfies all of the essential elements at the pleading stage. A defendant may very well believe that a plaintiff's cataloging of website features in the complaint does not make out a claim for protectable trade dress. But granting a dismissal motion based upon that belief would turn the litigation process on its head. A court must test the legal merits of a plaintiff's alleged trade dress at summary judgment or trial when the parties provide with all relevant, admissible evidence—not at the pleading stage when the court has little more than the plaintiff's allegations and the defendant's summary denial of them. So long as a plaintiff has alleged a complete recitation of the concrete elements of its alleged trade dress, it should be allowed to proceed.

There is no question here that Lepton Labs has satisfied that standard. It has set forth a list of nine features of its alleged trade dress and alleged that it is claiming "the particularized combination of all of these elements." (FAC ¶ 160.) Defendants might not believe that they are on notice of the "look and feel" of Lepton Labs's website, but that is an issue better tested at a later stage in the litigation. The Court thus finds that Plaintiffs have alleged protectable trade dress arising from the AllDaySlim website design.

The Court further finds that Plaintiffs adequately alleged that W4 used the allegedly infringing trade dress—that is, the SlimBlastFast website—in commerce.

1  Plaintiffs allege that W4 entered into another exclusive marketing agreement with
2  Gulf Rayz and Jensen to market SlimBlastFast and that W4 wholesale copied Lepton
3  Labs's trade dress in carrying out that agreement. Since SlimBlastFast is a product
4  sold in commerce, W4's participation in the advertising and marketing of it satisfies
5  the trade-dress-infringement use-in-commerce element. The Court accordingly
6  **DENIES** W4's Motion on this claim.

### C.   Contributory trade-dress infringement

Plaintiffs also bring a claim against all Defendants for aiding and abetting trade-dress infringement. The parties agree that this claim is more accurately characterized as contributory trade-dress infringement. The United States Supreme Court has recognized contributory trademark infringement, which occurs when "a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982). The Court presumes, as do the parties, that one may properly apply this standard to the trade-dress context.

W4 principally argues that Plaintiffs have failed to adequately allege aiding-and-abetting liability because there has been no underlying trade-dress infringement. W4 also contends that there has been no threshold allegation that it knew or should have known that Plaintiffs claimed to own trade-dress rights in their website or that W4 continued to supply a product or service to one it knew or should have known was infringing.

But Plaintiffs disagree, asserting that they have alleged that W4 intentionally induced the alleged infringement, directly profited from the infringement, were always aware that the Gulf Rayz defendants' website infringed Plaintiffs' rights, and continued to promote and market Defendants' website after Lepton Labs placed them on notice of the infringing conduct.

/ / /

Since the Court has already found that Plaintiffs alleged a viable trade-dress-infringement claim, W4's arguments related to there being no underlying violation consequently fail.

Moreover, the Court also finds that Plaintiffs have adequately pleaded contributory-infringement liability. Plaintiffs allege that W4 and the other Defendants knew that Gulf Rayz and Jensen were using Lepton Labs's trade dress in making the SlimBlastFast website but continued to supply their services. (FAC ¶ 173.) In fact, Lepton Labs alleges that W4 specifically provided the AllDaySlim trade dress to Gulf Rayz and then continued to consult with Gulf Rayz and Jensen about how to duplicate the website elements. (*Id.* Exs. C, G.) Plaintiffs thus easily meet the contributory-infringement pleading standard. The Court consequently **DENIES** Defendants' Motion on this ground.

## D.  Unfair Competition Law

The UCL prohibits "any unlawful, unfair or fraudulent business act." Cal. Bus. & Prof. Code § 17200. The Act is disjunctive, meaning that it prohibits an act that is either unlawful under another law or unfair or fraudulent as California case law has defined those terms. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

W4 argues that the Court should dismiss Lepton Labs's UCL claim because it has failed to identify which UCL prong gives rise to its claim. W4 also contends that Plaintiffs fail to allege reliance.

Plaintiffs allege that "Defendant W4 and the Gulf Rayz Defendants' methods of marketing, promoting and selling dietary supplement products, including, without limitation, SlimBlastFast, constitute *fraudulent, unlawful and/or unfair business acts or practices*." (FAC ¶ 177 (emphasis added).) While Defendants fault Plaintiffs for not tethering their claim to a particular UCL prong, the Court finds nothing wrong with Plaintiffs' pleading. By including all three prongs in their UCL claim, Plaintiffs have put Defendants on notice that they intend to pursue all possible avenues of UCL

1 liability. Nothing in California case law requires Plaintiffs to unnecessarily cabin
2 their claim to just one UCL prong. And for good reason. The Act prohibits "*any*
3 unlawful, unfair or fraudulent" business practices—not just one or the other. *See*
4 § 17200 (emphasis added).

5 W4 correctly notes that reliance is a necessary element of a UCL claim—at
6 least when a plaintiff brings a UCL claim predicated upon misrepresentations
7 constituting "unlawful" or "fraudulent" conduct. *In re Tobacco II Cases*, 46 Cal. 4th
8 298, 326 (2009) (fraudulent prong); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th
9 1350, 1355 (Ct. App. 2010) (unlawful prong). But the California Supreme Court has
10 not applied the reliance requirement as a straitjacket to prevent plaintiffs from brining
11 actionable UCL claims; rather, the Supreme Court has held that "a presumption, or at
12 least an inference, of reliance arises wherever there is a showing that a
13 misrepresentation was material." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009)
14 (internal quotation marks omitted). There is little question that Defendants' alleged
15 misrepresentation—that W4 was working exclusively with Lepton Labs to promote
16 AllDaySlim and that it would keep that information confidential—was material to
17 Plaintiffs' continued relationship with W4. Had Plaintiffs known that Defendants
18 were appropriating the AllDaySlim trade secrets and trade dress for themselves,
19 Lepton Labs certainly would have discontinued its relationship.

20 The Court accordingly finds that Plaintiffs have alleged a valid UCL claim and
21 thus **DENIES** W4's Motion on this ground.

22 **E. Fraud**

23 Lastly, W4 argues that Lepton Labs failed to allege a valid fraud claim. Fraud
24 pleadings are subject to an elevated standard, requiring a party to "state with
25 particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).
26 "Particularity" means that fraud allegations must be accompanied by "the who, what,
27 when, where, and how" of the misconduct charged. *Vess v. Ciba-Geigy Corp. USA*,
28 317 F.3d 1097, 1103–06 (9th Cir. 2003). Allegations under Rule 9(b) must be stated

with "specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Accordingly, when suing more than one defendant, a plaintiff cannot "merely lump multiple defendants together" but rather must differentiate the allegations and "inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Id.* at 764–65.

Under California law, the elements for an intentional-misrepresentation, or actual-fraud, claim are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. *UMG Recording, Inc. v. Bertelsmann AG*, 479 F.3d 1078, 1096 (9th Cir. 2007) (citing *Small v. Fritz Cos.*, 30 Cal. 4th 167, 173 (2003)); *Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1474 (Ct. App. 1997).

W4 again argues that Plaintiffs have failed to allege that its assurances regarding its ability to promote and market AllDaySlim were material to entering into an exclusive contract. W4 also faults Lepton Labs for not specifying who represented that W4's online dashboard was comprehensive and contained all of W4's then-current campaigns.

But Plaintiffs contend that they established that they would not have entered into the exclusive marketing agreement if they were aware of W4's simultaneous infringing conduct related to the Gulf Rayz defendants, SlimBlastFast, and Defendants' website. They also disagree that they need to specifically allege who made which statement; rather, they assert that the pertinent question is whether the plaintiff has demonstrated that it acted in a way different than it would have but for the defendant's misrepresentation.

The Court already resolved the materiality issue above, so W4's arguments with respect to that factor do not find much success under the fraud claim either. It is quite plain that Lepton Labs would not have entered into the exclusive marketing agreement

had it known that Defendants would ravage its confidential information to promote a competitor. This materiality likewise supports the reliance element, as Plaintiffs have alleged that their agreement with W4 was putatively exclusive, meaning that W4 would not enter into similar agreements with a competitor like Gulf Rayz.

The Court also finds little problem with Plaintiffs' inability to precisely allege at this stage who made the statement regarding the online dashboard's comprehensiveness. One must be mindful not to require a plaintiff to prove its case at the pleadings stage. Just because a plaintiff cannot recall or does not know who made a statement should not shut the plaintiff out of the courthouse—especially when it is rather clear that the statement emanated from a business that likely only includes a few individuals.

The Court accordingly finds that Plaintiffs have alleged an actionable fraud claim and thus **DENIES** W4's Motion on this ground.

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** W4's Motion to Dismiss. (ECF No. 22.) W4 shall file its answer to the First Amended Complaint within 14 days.

**IT IS SO ORDERED.**

September 23, 2014

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**